**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | CRIM. NO.  3:20-cr-00180-KAD |
| | : | |
| | : | |
| ARMANDO J. PEREZ | : | MARCH 29, 2021 |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The defendant, Armando "A.J." Perez, is a 65-year-old, former police officer of 37 years, who faithfully served the Bridgeport community his entire adult life, before losing nearly everything over the last seven months—his career, his reputation, and most of his life's savings—on account of his willingness to cheat during the Chief of Police Selection Process, and then lie about it to federal investigators.  It is a cautionary tale that will be retold long after this case is over.  What was supposed to be the crowning achievement of a public servant's career, has instead been his undoing.

As he comes before the Court for sentencing—a first-time, nonviolent offender subject to an 18-24 month advisory guideline range—Mr. Perez is a humbled man.  He has been shamed and vilified both locally and nationally, confronting multiple lawsuits that threaten the financial security of his family, including one brought by the Connecticut Attorney General to reduce and/or revoke his municipal pension—a particularly harsh consequence given that said pension was earned and vested in its entirety prior to the instant offenses.

As reflected in his acceptance of responsibility statement submitted as part of the presentencing process,[1] A.J. fully recognizes the wrongfulness of his conduct, and he fully appreciates that he has no one to blame but himself. Indeed, that is why, promptly after his arrest, he resigned and entered into a pre-indictment plea agreement, appearing before this Court to admit his guilt less than a month after his arrest. Another indication of both his total acceptance of responsibility and his desire not to unduly burden the system any more than necessary is the fact that he has already paid $74,703.50 in restitution to the Clerk of Court to address his share of the restitution owed to the City of Bridgeport.

A.J. has demonstrated his acceptance in other ways as well. After his change of plea, outside counsel for the City identified additional potential losses sustained by the City in the form of expenses incurred during the underlying investigation. A.J. led the effort to address this additional restitution claim. Those efforts were ultimately successful, resulting in an agreement to pay the City an additional $150,000, in a lump sum, jointly and severally with his co-defendant, Mr. Dunn. That agreement, coupled with the restitution amount included in the defendants' plea agreements, will result in $299,407.00 being paid to the Clerk's Office prior to sentencing, making the funds immediately available to the City upon entry of a final restitution order by this Court. To accomplish this, A.J. and his wife liquidated most of their life's savings, leaving only a small portion (along with his pension and his wife's modest salary) to pay their mortgage and repay over $125,000 in school loans for their children. Financially, the impact of

---

[1] A.J.'s personal statement regarding acceptance of responsibility has been provided to the U.S. probation office, to be included as an addendum to the PSR.

this case will have a lasting effect on A.J. and his family—a consequence that is incredibly punishing in its own right, especially for someone as proud and devoted to his family as A.J. is.  The many letters of support accompanying this memorandum make that clear.[2]

By this memorandum, we urge the Court to impose a non-Guidelines sentence well below the advisory range.  Such a sentence serves the goals of sentencing under 18 U.S.C. §3553(a), and it is justified in this case on a number of grounds.

*First*, A.J.'s personal history and characteristics—a significant factor under 18 U.S.C. § 3553(a)(1)—support a below-Guidelines sentence.  A.J.'s entire life has been one of public service, commitment to his community, and devotion to his family.  In his personal life, he is a gentle, trusted, and loyal husband, father, relative, and friend.  A.J. shows love to everyone, even during difficult times, such as when his son made the difficult decision to publicly transition from living as a man to living as a woman.  A.J. openly embraced his transgender child, publicly proclaiming his support at a gay pride parade covered by local media.[3]  In his professional life, he has risked his life as a patrol officer walking the beat in housing projects; investigated illegal trafficking and related crimes in the narcotics division; and supervised detectives solving violent crimes involving robbery, guns, assault, and homicide.  All of this was done years before he was ever seriously considered for the Chief position, and it should weigh heavily in the Court's analysis of what punishment is appropriate for his cheating and subsequent lying about an examination process that did not occur until the very end of his career.

---

[2] The character letters, with addresses and phone numbers redacted, are attached hereto as <u>Exhibit A</u>.
[3] *See* "'We love you': Bridgeport police chief talks about his transgender child," *Conn. Post*, June 15, 2020, available at <u>https://www.ctinsider.com/local/ctpost/article/I-said-We-love-you-Bridgeport-police-15341972.php</u> (last accessed Mar. 28, 2021).

3

*Second*, as noted above, A.J.'s sincere remorse, prompt and total acceptance of responsibility, and his extraordinary upfront efforts to pre-pay restitution stand out.  This post-offense conduct, although not extraordinary, merits substantial consideration.  As this Court knows, merely pleading guilty permits the Court to reduce a defendant's total offense level under the Guidelines by three levels.  But to earn that modest reduction a defendant need only admit the elements of the offense prior to trial, and also not frivolously deny any relevant conduct.  Here, A.J.'s sincere acceptance, prompt resolution of his case, and his proactive payment of full restitution is atypical, and substantially mitigating.

*Third*, although we do not dispute that there was a financial loss to the City— which has now been addressed through restitution—pecuniary gain was not A.J.'s primary motivation.  At the time he applied to be Chief of Police, A.J. was fortunate to enjoy a good salary and benefits—both as a senior police captain with over three decades of  experience, and as Acting Chief—and his compensation did not change substantially as a result of his appointment to the permanent Chief position in 2018.[4] Viewed in this context, it seems clear that any modest increase in his base salary did not drive A.J. to commit his crimes.  Rather, in choosing to pursue to the Chief job before retiring, A.J. coveted one, final reputational achievement before his retirement.

*Fourth*, the goals of sentencing have largely been achieved through the very public nature of the prosecution and the severe and life-altering financial consequences

---

[4] The Chief of Police position "came with a salary range of $132,374 to $145,428, plus benefits," while A.J.'s yearly earnings as a police captain in the years before his appointment were "$159,672.45 in 2012, $137,354.77 in 2013, $186,837.90 in 2014, and $196,444.85 in 2015 (the last full year before his appointment as Acting Chief on March 1, 2016)."  A.J. "earned $160,004.51 in 2016, $138,025.80 in 2017, $150,994.86 in 2018 (the year he was appointed Chief), and $154,081.34 in 2019."  PSR ¶92.

to A.J. and his family as a result of this case and the various civil litigations that have arisen in its wake.  If A.J.'s motivation was reputational achievement, having its fruits stripped from him in a very public, costly, and shaming way is an appropriate punishment.  Such a "civil death" is not something experienced by every criminal defendant, and it is a powerful form of punishment.  *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) ("my research and experience over two decades as a district judge, sufficient attention has not been paid at sentencing by me and lawyers—both prosecutors and defense counsel—as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant"); *id.* at 181 (discussing the concept of the "civil death" attendant to criminal convictions).

*Fifth*, while we agree that it is important to send a message that public officials will be punished for corrupt acts and lying, deterrence does not always require the imposition of a lengthy incarceration sentence.  Even in very high-profile cases that involve people in positions of trust—even those who made false statements to the FBI—courts have seen fit to impose probation sentences, or below-Guidelines sentences of less than one year.  For example, in *United States v. Scinto*, 3:10-cr-00207-CSH (D.Conn.), a well-known Fairfield County real estate developer illegally provided gifts to curry favor with public officials and City of Shelton employees over a period of ***nine years***.  *See Scinto*, ECF No. 29, at 2 (conduct occurred from 1999-2008).  Scinto pled guilty to making a false statement under 18 U.S.C. §1001 and faced a sentencing range of 21-27 months according to the PSR.  Rather than impose a lengthy sentence within this range, the Court rejected the guideline calculation used in the PSR and instead

imposed a sentence of 6 months, followed by 24 months of supervised release. During the first six months of supervised release, Mr. Scinto was placed on home confinement with electronic monitoring.  *See Scinto*, ECF No. 31.  More recently, in *United States v. Clinesmith*, 20-CR-165 (JEB) (D.D.C.), the court sentenced the FBI lawyer who admitted to doctoring an email that was used to justify secret surveillance of a former Trump campaign adviser to only 12 months of probation, instead of a split sentence. The straight probationary sentence was imposed even though the Government, citing the goal of deterrence, requested a sentence of incarceration.  The sentencing court did, however, require Clinesmith to perform 400 hours of community service during the 12 months.  *See Clinesmith*, ECF No. 46, at 4.

*Sixth*, A.J. has never been subject to a criminal sentence before in his life. Accordingly, as noted by the U.S. Probation Office, "[a]s a basis for a downward variance, the Court may consider incremental punishment and the custodial range provided in the advisory guideline calculation as greater than necessary to achieve the goals of sentencing."  PSR ¶118.  This is another way of saying that the Court can show mercy when an offender faces unduly harsh consequences under the Guidelines.  To reach a more just sentence, the Court can consider a lower sentence, as well as non-custodial sentencing options (including probation, supervised release, home confinement, community service hours, or a fine) in lieu of, or in combination with, a substantially reduced period of incarceration.

Finally, the Court must consider the need for the sentence to provide A.J. with medical care in the most effective manner, *see* 18 U.S.C. §3553(a)(2)(D), a goal of sentencing that cannot be accomplished through imprisonment.  *See Tapia v. United*

*States*, 564 U.S. 319, 330 (2011) ("Do not think about prison as a way to rehabilitate an offender.").  As the Court is aware, A.J. is 65 years of age and he suffers from hypertension, both of which make him susceptible to serious complications from COVID-19.  Although he may be fully vaccinated soon, sending him to prison would likely increase the likelihood of contracting the disease, or one of its variants, due to the uniquely challenging conditions faced by our prisons during this dangerous time.  Indeed, it is now well established that prisons have been unable to adequately protect inmates once the virus has been introduced into a prison environment.  In addition, as the Court is now aware, A.J. has been struggling privately with another medical issue for which he has received testing and treatment.  *See* PSR ¶84.  This condition is potentially very serious and needs to be carefully monitored over the next 12-18 months to determine if the condition is getting worse.  Allowing him to remain in the community as much as possible to receive the necessary treatment will allow his wife and medical providers to closely monitor his condition.

In the end, after weighing all of the §3553(a) factors—and especially in light of the punishment and collateral consequences that A.J. has experienced already—we respectfully submit that non-Guidelines sentence substantially below the advisory range, with a period of home confinement in lieu of complete incarceration, and a joint and several restitution order of $299,409, is a just sentence that is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

## <u>Argument</u>

A sentencing court is obligated to fashion a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing under 18 U.S.C.

§3553(a).  As a procedural matter, "'[a] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.'" *United States v. Dorvee*, 616 F.3d 174, 180 (2d Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)); *see also Rita v. United States*, 551 U.S. 338, 351 (2007).  Next, the court must determine whether or not to apply any of the Guidelines' departure policy statements to adjust the Guideline range.  *See generally* U.S.S.G. §1B1.1(a)-(c). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party," including whether a non-Guidelines sentenced is warranted.  *See Gall*, 552 U.S. at 49-50; *see also Dorvee*, 616 F.3d at 174.  "In so doing, [the district judge] may not presume that the Guidelines range is reasonable," but instead he should "make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  "After announcing the sentence, the judge 'must adequately explain the chosen sentence to allow for meaningful appellate review.'" *Dorvee*, 616 F.3d at 174 (quoting *Gall*, 552 U.S. at 50); *see also Rita*, 551 U.S. at 356-57 ("when a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation").

        "Wide latitude is afforded to sentencing courts in crafting sentences 'sufficient, but not greater than necessary' to achieve the sentencing objectives set forth by Congress." *United States v. Stewart*, 686 F.3d 156, 173 (2d Cir. 2012).  Moreover, a sentence that is "sufficient, but not greater than necessary" under 18 U.S.C. §3553(a) is the ***lowest possible sentence*** that accounts for all of the relevant statutory factors.  In other words, if a district court believes a lower sentence will be as effective as a higher

8

sentence in light of the relevant factors, it must choose the lower sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher.").

I.    **THE SENTENCING FACTORS UNDER 18 U.S.C §3553(a) SUPPORT A NON-GUIDELINE SENTENCE SUBSTANTIALLY BELOW THE ADVISORY RANGE**

In determining what sentence will best achieve these statutory purposes of sentencing, the Court must consider the following factors:

1.    The nature and circumstances of the offense and the history and characteristics of the defendant;
2.    The kinds of sentences available and the applicable sentence under the Sentencing Guidelines;
3.    Pertinent policy statements issued by the Sentencing Commission;
4.    The need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct; and
5.    The need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1), (a)(3) - (a)(7).

When considering each of the statutory factors under §3553(a), the U.S. Supreme Court has made it clear that the sentencing process should focus carefully on the individual, and not merely on the crime itself.  "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (internal citations and quotations omitted); *see also Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of

more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

**A.     Mr. Perez's Life of Public Service, Dedication to Family, and Recent Medical Issues**

Until the events of this case, A.J. was one of Bridgeport's many immigrant success stories.  He was born in Cuba, just before the communist movement led by Fidel Castro overthrew the government of Fulgencio Batista in 1959.   Castro immediately nationalized businesses and began attacking potential political opponents and Batista supporters.  A.J.'s father was in the military and was a weapons expert in the Batista government.  Because his father refused to teach his knowledge of weapons to those in the Castro military, he was forced to leave the military.  He worked briefly at the United Illuminating Company but was eventually fired for not cooperating with the regime, and afterwards the family struggled financially.

A.J.'s family then made the difficult choice to leave Cuba, immigrating to the United States when A.J. was only 12.  They settled in Bridgeport to be near relatives. The change in culture was a challenge for A.J., and nothing came easy.  When he arrived, he spoke no English.  As a result, even though he had already completed the 8th grade in Cuba, he was placed back in the 5th grade when he started school in the Bridgeport public school system.  Despite the stigmatizing effect of this early grade school placement, A.J. persevered.  He applied himself, learned English, succeeded in school, and graduated from Kolbe High School (now Kolbe Cathedral High School) in 1976 at the age of 20.

10

After a year of college, and working other jobs to help support his family and two younger brothers, A.J. finally found his calling as a Bridgeport police officer in 1983.  He started out as a patrol officer, walking the beat in Father Panik Village, a housing project notorious for illegal drugs and violence.  In 1988, the Associated Press described it as a "battlefield,"[5] with the frequent echoes of gunshots, drug deals on street corners, walls marked with graffiti, and "hallways smell[ing] of urine."[6]  Being an officer in Bridgeport in the 1980s was a rough and dangerous job, and A.J.'s experience was no exception.  Over the years, he slowly and steadily worked his way up through the department, receiving promotions to sergeant (1990-2001), lieutenant (2001-2009), and then captain (2009-2016). Throughout that period of time, A.J. served in various critical roles at the department.  He was Executive Officer for the Office of Internal Affairs (1994-2001), Executive Officer to the Chief of Police (2001-2005), Commanding Officer of the Narcotics and Vice Division (2009-2014), and Commanding Officer of the Detective Bureau (2014-2016).

In 2016, A.J. was named the Acting Chief of Police.  As Acting Chief, A.J. displayed all of the traits that one would expect to see in a dedicated public servant.  Those who interacted with him commented on his personal style, his deep commitment to the community, and his availability whenever someone needed help.  When interviewed by the Connecticut Post in 2018, several City Council members praised A.J. for these qualities, stating that they "had never met a person who cares about this city like Chief Perez does," they were impressed how his "door is always open," and one

---

[5] *See*  www.apnews.com, "Father Panik Village Still Plagued By Crime, Money Problems," (Apr. 2, 21988), available at https://apnews.com/article/d3a64f1081322347f791ea177f3187e8 (last accessed Mar. 28, 2021).
[6] *Id.*

Council member noted "several times that she has approached the acting chief on behalf of one of her constituents and his response has been, 'Here's my card. Have (them) call me directly.'"[7]  No matter what is said about A.J. Perez now, no one can question his deep commitment to the job, to the Department, or to Bridgeport and its citizens.

While he was Acting Chief, he also worked extremely hard to change the culture of violence that plagued the City of Bridgeport.  As a true believer in community policing, he was visible in the community, seeking to engage members of the clergy (of all denominations), community activists, and various neighborhood groups, to stop the violence and address street crime.  He was also an early supporter of various forms of technology within the police department.  For example, during his tenure, the City was able to establish a Real Time Fusion Center with high definition camaras in all of the City schools and hot spots.  He was also an avid supporter of body cameras for officers. In fact, today, all uniformed officers have body cameras, as well as cameras in their patrol vehicles.

Notwithstanding the events that underlie the instant case, A.J.'s commitment to the Chief position mirrored the commitment he demonstrated as Acting Chief.  A.J. led the Bridgeport Police Department during the COVID-19 pandemic, one of the most challenging times in recent memory for local government, the country, and the world. From March 2020 up until his resignation in September 2020, he worked tirelessly to keep his officers safe, he adapted the department to the needs of the community, and

---

[7] *See* "Ganim makes Perez Bridgeport's permanent cop chief," Conn. Post (Nov. 5, 2018), available at https://www.ctpost.com/local/article/Ganim-makes-Perez-Bridgeport-s-permanent-cop-13364763.php (last accessed Mar. 28, 2021).

he worked collaboratively with municipal agencies to ensure that the City's residents were kept safe.  In other words, his compassion for the City and its residents was on full display.

Of course, all of this hard work was not without personal sacrifice.  A.J. was always on the go, answering a call, running down to the police station, or attending a City meeting.  One of his wife's close friends, Krystal Taylor, described how the demands of A.J.'s job impacted his family:

> As time progressed and I became closer to their family, I understood the impact that AJ's position had on their family. Similar to when someone serves in the armed forces and their family feels the effect of that, AJ's family served with him. There were many times that AJ had to set aside his family to serve the citizens of Bridgeport. There were holidays, birthdays, family dinners, and many cancelled family vacations, where AJ was called on by his officers and he went, to serve by their sides, not to just give commands but actively be there with them. His family understood and supported him with love.

Ltr. from K. Taylor, BSN, RN.

The observations made by Ms. Taylor are consistent with the other observations mentioned in the character letters submitted to the Court.  These letters describe a person who has a "boundless love for his family,"[8] "who truly, and passionately, embraced his law enforcement calling,"[9] with "compassion for the residents of Bridgeport,"[10] who "always displayed a deep empathy for the Bridgeport community."[11] He was "a dedicated community leader."[12]

---

[8] Ltr of Isabel Del Pino Allen ("His absolute and publicly proclaimed acceptance and love for his transexual daughter evidences the strength and kindness of his character.").
[9] Ltr. of Michelle Armstrong.
[10] Ltr .of Letha Dardani.
[11] Ltr. of Lydia Martinez.
[12] *Id.*

A.J.'s arrest and prosecution have come as a shock to his family and those closest to him, and A.J. is obviously disappointed with himself and with the personal weakness he displayed in deceiving the Selection Committee, and then lying to law enforcement to avoid the shame and consequences of what he did.  It is a fall from grace that has been punishing and painful.

Unfortunately, in addition to the stress and anxiety associated with this prosecution and its attendant consequences, A.J. has received devastating news that he has another medical condition that could be very serious.  As the Court knows from the report submitted the U.S. Probation Office, the symptoms A.J. has been experiencing have been progressing slowly.  Careful monitoring by his family and medical providers, coupled with another re-evaluation in the next 12-18 months, will be critical in assessing the extent of the condition.  In light of this diagnosis, A.J. is even more determined to spend as much time as possible with his family, and every moment is now that much more precious.

It has been said that the most agonizing pain is the pain of regret, for which there is no lasting relief and no remedy.  A.J. is deserving of punishment for his crimes, but he is being punished already. Today, instead of living out his retirement as a pillar of his community with the distinction of being the first Hispanic Chief of Police of the City of Bridgeport, A.J. faces his retirement years as a pariah and litigation target, without any lasting relief from the consequences of his own criminal conduct.  He continues to face financial uncertainty after liquidating much of his savings, and he faces civil litigation that could result in court ordered attachments of his remaining assets and the revocation of his pension—all the while living with the possibility that his more recent

14

medical condition may get worse, leaving his family with an even greater financial and emotional burden to bear in the future.  These are undoubtedly harsh consequences for crimes that involved cheating during an examination process in pursuit of a promotion, and then lying about it.

      **B.**    **<u>Nature and Circumstances of the Offense</u>**

The Information and the PSR summarize the conduct that underlies A.J.'s convictions.  And there is no dispute about what happened when it comes to A.J.'s involvement.  He cheated during the process, and then lied about it afterward.

The Selection Process involved four discrete stages: (1) submission of a resume and cover letter, (2) a written examination that involved an employment questionnaire about the applicant's experience and two essay questions, (3) an oral examination by telephone, and (4) a final interview with an independent, five-member panel.  A total of 16 candidates applied for the position.  At the end of this process, the panel was supposed to recommend three of the candidates, from which the mayor would select the next Chief of Police.  If A.J. was not in the final three, he would not even be eligible to be appointed.

During the initial stages of the process, A.J. took steps on his own to make sure he could get through to the next stage.  Specifically, he relied on assistance from two fellow officers to prepare his cover letter and resume, and these same officers helped him complete the questionnaire and the essay questions.  A.J. did not issue an order to these officers that they do this for him—in fact, he thought they did so willingly—but he did not disclose that he received this help.  Using others to substantially complete portions of the written examination was also contrary to the examination's instructions,

which stated: "This questionnaire represents a testing process (points will be assigned so complete all questions) and as such you are to complete it yourself."  PSR ¶18.

To ensure that A.J. made it into the top three, David Dunn made changes that benefitted A.J.  Among other things, he modified the search criteria to eliminate any requirement that the candidate have a college degree (A.J. did not have a college degree); he arranged for an officer's experience to have significant weight in the scoring (A.J. had many years of police officer training and experience); and he shared with A.J. (and only A.J.) a list of possible test questions in advance of both the telephone oral examination and the final panel interview, thereby giving A.J. an advantage in the process that others did not receive.  Dunn also allegedly telephoned a member of the five-member panel to tell him that the Mayor wanted A.J. to be "in the top three."  PSR ¶28.  When interviewed about it, the panelist denied that this comment from Dunn affected his own decision-making, but the statement obviously was consistent with the overall objective pursued by A.J. and Dunn.

Whether the test questions and other assistance provided by Dunn were what ultimately carried A.J. into the top three cannot be known for sure, but A.J. agrees that he willingly agreed to, and accepted, the help that he received.  As noted in his personal statement, he allowed his personal ambition and self-serving rationalizations—such as the well-worn sentiment about "how things are done in Bridgeport"—to cloud his better judgment, as well as lifetime commitment to honoring and upholding the law.

A.J.'s conduct also included lying.  When initially confronted by agents in February 2019, A.J. deflected and denied that he had received "confidential information," testing questions, or other information "that would give him an advantage

16

over other candidates…."  PSR ¶35.  When he was re-interviewed in May 2020, this time with his attorney, A.J. made false statements, including denials of facts that were supported by secret recordings provided to law enforcement by one of the police officers who had helped A.J. during the examination process.  *See* PSR ¶41.

Why did he lie?  To avoid the consequences of his wrongful conduct and to prevent the world from knowing that the process had been corrupted and that he did not get the Chief of Police position "all on his own."  He was desperate for those facts not to come out.  In his acceptance of responsibility statement to the Court, he acknowledged this motivation and he made it clear that he knows that there must be consequences: "As a police officer, I understand the importance of honesty and not lying to investigators.  In choosing to lie, I further damaged my reputation and dishonored on all those who have loved and supported me throughout my career."

### C.    The Guidelines and The Kinds of Sentences Available

The plea agreement and the PSR each calculate the applicable Guideline range to be 18 to 24 months of imprisonment.  *See* PSR ¶102.  Because this range is in Zone D, probation is not authorized by the Guidelines.  *See* PSR ¶109; U.S.S.G. §5B1.1.  However, under the applicable statute, A.J. is eligible for not less than one nor more than five years' probation because his offenses are only Class D Felonies. *See* PSR ¶107; 18 U.S.C. § 3561(c)(1).

Contrary to popular perception, the non-custodial portion of a sentence—whether it is straight probation or period of supervised release—is indeed "punishment" under our federal sentencing laws, and should be actively considered by the Court when fashioning a sentence.  In *Gall v. United States*, the U.S. Supreme Court squarely

17

rejected the notion that probation and other non-custodial sentences are not

punishment under 18 U.S.C. §3553(a):

> Offenders on probation are nonetheless subject to several
> conditions that substantially restrict their liberty . . . Inherent in the
> very nature of probation is that probationers do not enjoy the
> absolute liberty to which every citizen is entitled . . . . Probationers
> may not leave the judicial district, move, or change jobs without
> notifying, and in some cases receiving permission from, their
> probation officer or the court.  They must report regularly to their
> probation officer, permit unannounced visits to their homes, refrain
> from associating with any person convicted of a felony, and refrain
> from excessive drinking.  Most probationers are also subject to
> individual "special conditions" imposed by the court.

*Gall*, 552 U.S. at 48-49; *see also* ABA Standards on Criminal Justice, Sentencing 18-

6.4(a), p. 227 (3rd ed. 1994) ("A sentencing court should prefer sanctions not involving

total confinement in the absence of affirmative reasons to the contrary.").

    In addition to the Supreme Court, Congress has observed that alternatives to

incarceration should be explored prior to imposing a sentence of imprisonment.  As part

of the Sentencing Reform Act of 1984, Congress recognized "the general

appropriateness of imposing a sentence other than imprisonment" where, as here, the

defendant has no criminal history and is convicted of a non-violent offense.  Thus, even

before the unique concerns surrounding a defendant's risk of serious infection or death

from COVID-19, a sentence of probation and restitution, with conditions, was deemed

consistent with Congressional intent and the purposes of 18 U.S.C. §3553(a).

    As a condition of probation, the Court can also impose a requirement of home

detention in lieu of incarceration, in addition to ordering community service hours.  The

hours should not, however, be in excess of 400 hours.  *See* U.S.S.G. 5F1.3 cmt. n. 1

(recommend that "[c]ommunity service generally should not be imposed in excess of 400 hours.").

D.    **No Unwarranted Disparity Will Be Created By A Below-Guidelines Sentence**

Pursuant to §3553(a)(6), a sentencing court must also take into account "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and this extends to defendants sentenced within the same case.  *See Gall*, 128 S.Ct. at 600; *see also United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007) ("the plain language of §3553(a)(6) does not on its face restrict the kinds of disparity a court may consider"); *United States v. Fernandez*, 443 F.3d 19, 31 n. 9 (2d Cir. 2006) (same).  Whether any difference among sentences is warranted, or unwarranted, depends on the individual circumstances of each case and their relationship to the purposes of sentencing.  "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing."  U.S. Sent. Comm'n*, Fifteen Years of Guidelines Sentencing:  An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform*, at 113 (2004).[13]  Thus, while this factor calls for equal treatment for similarly situated offenders, "it is worth noting that equal treatment consists not only of treating like things alike, but also of treating unlike things differently according to their differences."  *United States v. Irey*, 612 F.3d 1160, 1205 (11th Cir. 2010) (en banc).

---

[13] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (last accessed Aug. 18, 2020).

Here, no unwarranted disparity would be created by a sentence well below the advisory range.  Indeed, national sentencing data shows that nearly a quarter of all defendants in A.J.'s advisory range are actually sentenced to probation instead of imprisonment.  Nationally, U.S. Sentencing Commission data for fiscal years 2015-2019 for defendants sentenced under U.S.S.G. §2B1.1, who, like A.J., are also 60 years of age and in Zone D of the Sentencing Table, 24% (503 cases) received probation, or probation with alternatives to incarceration.[14]  In the Second Circuit, for defendants with this same criteria, 21% (40 cases) received a probationary sentence.[15]  In the District of Connecticut, probationary sentences for elderly defendants in this range were imposed in 37.5% of the reported cases.[16]

Below-Guideline sentences have also been imposed in other high-profile public corruption cases in this District.  As previously noted, in *United States v. Scinto*, 3:10-cr-00207-CSH (D.Conn.), a well-known Fairfield County real estate developer who illegally provided gifts to public officials over a period of nine years, and then lied to the FBI about it in violation of 18 U.S.C. §1001, was sentenced to 6 months of imprisonment, followed by 2 years of supervised release, with the first six months on home confinement with electronic monitoring.  *See Scinto*, ECF No. 31.

Thus, even though it is critically important that public officials be truthful, especially when they are interviewed in a federal investigation, a non-Guidelines sentence can address this criminal conduct, and it will not generate unwarranted disparities.

---

[14] *See* U.S. Sent'g Comm'n, Interactive Data Anlyzer, available at
https://ida.ussc.gov/analytics/saw.dll?Dashboard.
[15] *See id.*
[16] *See id.*

### E.    The Need for Restitution Has Been Satisfied

This is always an important factor in a case involving fraud and a claimed loss to the victim.  Here, as noted above, A.J. and his co-defendant, David Dunn, have prepaid the restitution agreed to in their plea agreements, and they have reached an agreement with the City to Bridgeport to reimburse the City for cost and expenses associated with the investigation.  The total amount of this restitution, $299,407.00, will be deposited in the Clerk's Office at the time of sentencing.

## II.    THE GOALS OF SENTENCING SUPPORT A NON-GUIDELINES SENTENCE WELL BELOW THE ADVISORY RANGE

The sentence to be imposed on Mr. Perez must comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation."  Dean v. United States, 137 S. Ct. 1170, 1175 (2017); see also Gall, 552 U.S. at 50, n. 6; 18 U.S.C. § 3553(a)(2)(A)-(C).  The sentencing statute also mandates consideration of the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. §3553(a)(2)(D).

### A.    Just Punishment

The concept of "just punishment" under §3553(a)(2)(A) refers to the need for a defendant's punishment to fit the crime.  In the Senate Report accompanying the Sentencing Reform Act, the Act's sponsors explained:

> [Just punishment]—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably

21

harsh under all the circumstances of the case and should not differ
substantially from the sentence given to another similarly situated
defendant convicted of a similar offense under similar circumstances.

S. Rep. 98–225, 1984 U.S.C.C.A.N. 3182, 3258–59.

A.J.'s arrest and prosecution has destroyed his reputation and jeopardized the
financial security of his family.  Having the reputational achievement that he coveted
stripped from him in a very public, costly, and shaming way is "just" under the facts of
this case.  It is also appropriate to have A.J. reimburse the City of Bridgeport for the
losses directly attributable to his actions, which he has now done.  Given the severity of
these consequences, and the reality that he is struggling with a medial condition that
may well rob him of any enjoyment of his future years, a lengthy period of incarceration
is not needed.

**B.**     **Deterrence**

Section 3553(a)(2)(B) instructs the Court to consider whether the sentence
provides adequate deterrence to criminal conduct.  This concept embodies two related
concepts: general deterrence (deterring the public from crime) and specific deterrence
(deterring the defendant from future criminal behavior).

The National Institute of Justice—the research, development and evaluation
agency of the U.S. Department of Justice—has noted the following about deterrence
theory:

1.     "The certainty of being caught is a vastly more powerful deterrent than the
punishment."

2.     "Sending an offender to prison isn't a very effective way to deter
crime."

3.     "Police deter crime by increasing the perception that criminals will    be
caught and punished."

4.      "Increasing the severity of punishment does little to deter crime."[17]

Applying this research, general deterrence is accomplished in this case, first and foremost, by the fact of A.J.'s prosecution and the publicity surrounding the consequences to him.  If cheating and lying in connection with a government civil service examination process to obtain an employment contract will result in these kind of consequences, employment candidates will surely seek to avoid what A.J. has gone through.  He is a walking, living, breathing cautionary tale of what **not** to do when applying for a Government promotion or contract.

The Government will surely raise the issue of his lying to law enforcement and the need for deterrence as to that particular crime.  And they would be right.  But a lengthy sentence of incarceration is not automatically required.  As noted by the court's 12-month probation sentence in the *Clinesmith* case, *supra*, and the 6-month incarceration sentence in *Scinto*, deterrence can be achieved in other ways.

## C.      Protection of the Public

Pursuant to 18 U.S.C. §3553(a)(2)(C), the Court must also consider whether a particular sentence is needed "to protect the public from further crimes of the defendant."  As noted above, A.J. is 65 years old, he has no criminal record, and is suffering from a progressive neurological disorder.  He is not a risk to anyone at this point, and we suspect that even the Government will agree that a sentence of incarceration is not needed to serve this particular goal.

---

[17] *See* NIJ, "Five Things About Deterrence (citing Daniel Nagin, "Deterrence in the 21st Century," in *Crime and Justice in America 1975-2025* (ed. Michael Tonry, Univ. Chicago Press, 2013), available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.  The fifth finding about deterrence—that "[t]here is no proof that the death penalty deters criminals"—is not applicable here.

### D.   **Rehabilitation**

Pursuant to 18 U.S.C. §3553(a)(2)(D), courts also must consider the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  In fulfilling this objective, it is widely acknowledged that imprisonment is not to be used as vehicle by which to achieve rehabilitation.  *See Tapia*, 564 U.S. at 330 (lengthening sentence to "promote rehabilitation" violates §3582(a)); *id.* ("Do not think about prison as a way to rehabilitate an offender."); *United States v. Anderson*, 15 F.3d 278, 282 (2d Cir. 1994) (discussing 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k)).

In addressing this goal of sentencing, the Court should carefully consider any risks to a defendant's health if he is incarcerated.  This presents a unique challenge given the ongoing nature of the COVID-19 pandemic.  Courts have already recognized that CDC guidance, such as social distancing, is simply "impossible to achieve in our federal prisons"—particularly during a lockdown.  *See Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *23 (D. Conn. May 12, 2020) ("even with the measures that the Warden has put in place, due to the impossibility of adequate social distancing, confinement at FCI Danbury—due to the very structure of the facility—continues to pose a grave risk to vulnerable inmates' health").  Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings.  Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout BOP facilities.

A.J.'s age and hypertension make him susceptible to serious complications from COVID-19.  Although he may be fully vaccinated soon, sending him into a prison environment would increase the likelihood of exposure to the disease, or one of its variants.  His vaccination would help protect him from infection, but it cannot ensure his safety.

In addition, A.J.'s other medical condition is such that he will require careful monitoring by his family and doctors.  In a prison setting, he could deteriorate and become a danger to himself.  Allowing him to remain in the community to receive the necessary treatment while on probation would be the best way to address this particular goal of sentencing.

## Conclusion

For all the foregoing reasons, and for any other reasons that this Court deems fair and just, we respectfully submit that non-Guidelines sentence substantially below the advisory range, with a period of home confinement in lieu of complete incarceration, and a joint and several restitution order of $299,409, is a just sentence that is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

Respectfully submitted,

*/s/ Robert M. Frost, Jr.*
Robert M. Frost, Jr. (ct 19771)

FROST BUSSERT, LLC
350 Orange Street, Suite 100
New Haven, CT 06511
Tel:        (203) 495-9790
Fax:       (203) 495-9795
Email:     rmf@frostbussert.com

ATTORNEY FOR DEFENDANT

25

**CERTIFICATION**

I hereby certify that on this date a copy of the foregoing pleading was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.


Dated at Guilford, Connecticut on this 29th day of March 2021.



/s/ Robert M. Frost, Jr.
Robert M. Frost, Jr.

26