# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:20-cr-180 (KAD) |
| v. | |
| ARMANDO J. PEREZ | April 5, 2021 |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

In connection with the sentencing of defendant Armando J. Perez, scheduled for April 12, 2021, the Government respectfully submits that a meaningful term of imprisonment is appropriate and represents a balanced consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).

## BACKGROUND

Perez and his co-defendant David Dunn were trusted to serve the City of Bridgeport and its citizens as public officials. Instead, Perez, who was the Acting Chief of the Bridgeport Police Department ("BPD"), and Dunn, the City's Acting Personnel Director, engaged in a nine-month conspiracy to secretly rig the purportedly open and competitive examination process for a permanent BPD chief. More specifically, Perez and Dunn, working together, manipulated that search process by tailoring the scoring criteria to favor Perez, using BPD officers to prepare Perez's examination materials, stealing confidential examination questions, and attempting to influence an exam panelist. As a result of the scheme, the City was deceived into ranking Perez among the three examination finalists, and ultimately awarding him a five-year contract as the permanent chief. Compounding these crimes, when Perez became aware that the FBI was looking into his conduct, he sought to obstruct the investigation by influencing potential witnesses and knowingly making false statements to investigators.

I.        **Perez's Scheme to Corrupt the Hiring Process**

Before his appointment as chief, Perez was a BPD officer for over 30 years, and close with

Bridgeport Mayor Joseph Ganim since Ganim's first tumultuous tenure as mayor, which ended in

2001.[1]   Shortly after Ganim's re-election in November 2015, he appointed then-Captain Perez,

who had assisted him in his campaign, to serve as the acting chief, bypassing several higher-ranked

officers.  Presentence Report, dated February 3, 2021 ("PSR") ¶ 9.

In March 2018, the City commenced its search for a permanent police chief, which Dunn

supervised as the City's Acting Personnel Director.  PSR ¶ 10.  Pursuant to the City's Charter,

Dunn was required to conduct an "open and competitive" "examination" to determine the three

highest-ranked applicants, from which the Mayor could select a permanent chief.[2]  PSR ¶ 11.

Moreover, Ganim's Chief of Staff stressed to Dunn that the search must be conducted

---

[1] Perez served as Ganim's driver for a time prior to Ganim's indictment and eventual conviction for racketeering, racketeering conspiracy, honest services mail fraud, bribery, conspiracy to commit bribery, and filing false income tax returns, for which Judge Janet Bond Arterton sentenced Ganim to 108 months' imprisonment.  As the trial in that case revealed, at Ganim's request, Perez had held investment-grade wine that had been part of a payoff to Ganim.  Perez was not charged, although he testified that if he had seen any wrongdoing by Ganim he would not have reported it to law enforcement, but instead simply would have requested a new position.

[2] The City's Charter provides:

> The examination for the position of chief of police shall be open to any person possessing the minimum qualifications established for such position regardless of whether the applicant is currently or has ever been an employee of the city of Bridgeport.  The examination shall be open and competitive and shall not be promotional. Whenever a vacancy arises in the position of chief of police, the personnel director shall, upon request, certify to the mayor the names of the three (3) candidates standing highest upon the employment list for such position.  If no such list exists, the personnel director shall, within 150 days of the request, hold a test for such position and shall, upon the establishment of an employment list, certify to the mayor the names of the three persons standing highest thereon.

Bridgeport City Charter, Chapter 13, Sections 4(b)(2) & (3).

professionally, fairly, and timely.  Complaint ¶ 17.  Consistent with the City's public statements that the search was being conducted in an open and competitive manner consistent with the Charter, in March 2018, Dunn had the City hire an outside consultant, Randi Frank, to conduct the examination process.[3]  PSR ¶ 12.

The permanent chief examination had four stages: (1) Frank's screening of resumes and cover letters; (2) a written exam, comprised of a questionnaire and two essay questions, graded by Frank; (3) a telephonic oral exam conducted by Frank; and (4) an in-person interview by five outside panelists, moderated by Frank.  *Id.*  Working together, Perez and Dunn corrupted each of these stages for Perez's benefit.  Perez used BPD officers under his command to draft his examination materials, then used confidential information obtained from Dunn to prepare for the oral exam and panel interview; while Dunn provided Perez with confidential examination materials, adjusted the examination scoring to help Perez, and tried to induce an exam panelist to favor Perez.

### A.      Stage 1: Resume and Cover Letter

Frank began the process in May 2018 by preparing and advertising a profile for the permanent BPD chief position, which listed the minimum qualifications.  PSR ¶ 13.  Dunn instructed Frank that a bachelor's degree was not a requirement, and there should be no penalty for a candidate without one.  *Id.*  This was to Perez's advantage, since he was the only applicant for the position who did not have a bachelor's degree.  *Id.*

On May 31, 2018, Dunn forwarded to Perez (but not to other applicants) an email from Frank containing non-public information about the status of the search, asking Perez, "R u ready

---

[3] Frank had previously worked for the City under Dunn's direction, both in the City's 2010 police chief search and the City's search for a Sikorsky Memorial Airport manager.

to mail your resume?"  PSR ¶ 15.  Perez enlisted two BPD officers under his command, Officer-1 and Officer-2, to prepare his resume and cover letter.  *Id.*  Perez scheduled multiple meetings with Officer-1 and Officer-2 to discuss these application materials, each time using an innocuous meeting name in the email invitation (*i.e.*, "[Officer 2] – Consultation" and "Meet with [Officer-2]").  *Id.*  Officer-1 and Officer-2 worked on Perez's resume and cover letter at least in part while on BPD time, in BPD offices, and using BPD computers.  *Id.*  On June 11, 2018, Perez emailed a resume and cover letter to Frank that Officer-1 and Officer-2 had prepared.  *Id.*

Around this time, Perez began telling other BPD officers that he would be selected as the next BPD chief.  Perez told one BPD officer that Ganim had said, "You're my guy.  You have it."  Perez told another officer that Ganim had promised him the job regardless of who applied.  (Later, while the examination process was ongoing, Perez told his BPD driver that the chief job was his, saying "don't worry, I'm going to be the Chief.")

Eventually, Frank received resumes from 16 applicants, and, after consulting with Dunn, eliminated five for failing to meet the required qualifications.  PSR ¶ 17.

### B.    Stage 2: Written Exam

On May 21, 2018, Frank emailed Dunn the questionnaire and essay questions that she intended to use for the second stage of the selection process, along with the associated scoring guide that set forth the points to be awarded for various types of answers on the candidates' questionnaires.  PSR ¶ 14.  Dunn forwarded that email from his City email to his personal email, and Perez later gave Officer-1 a copy of Frank's scoring guide—circumstances strongly suggesting that Dunn gave the scoring guide to Perez for his use during the application process.

Nearly a month later, on June 18, 2018, Perez and the other ten applicants received the written exam from Frank, which consisted of a three-page questionnaire and two essay questions.

PSR ¶ 18.  Frank's email instructed Perez to complete the exam by himself: the "Written Exam/Questionnaire will be graded, so please complete yourself and please provide accurate/truthful information. . . ."  *Id.*  The instructions on the written exam were similar: "This questionnaire represents a testing process . . . and as such you are to complete it yourself.  Similar to an application you need to be truthful; discovery of inaccuracies will be cause for rejection/disqualification."  *Id.*  In violation of those clear and plain instructions, Perez enlisted Officer-1 and Officer-2 to help complete his written exam on BPD time.  Perez hid the fact of their assistance by inviting them to meet under the subject "Private Matters."  Complaint ¶ 42.

In grading the applicants' examinations, Dunn requested multiple changes to the scoring process that worked to Perez's benefit.  PSR ¶ 19.  Dunn had Frank add more points for applicants with more than 20 years of law enforcement experience (which Perez had), not award any extra points to applicants who were Bridgeport residents (which Perez was not), and not penalize applicants without a Bachelor's degree (which only Perez did not have).  *Id.*  After discussions with Dunn, Frank also agreed to award extra points to Perez for his service as acting police chief. *Id.*  Using this scoring process, Frank eliminated three more applicants, leaving eight, including Perez.

### C.    Stage 3: Telephone Exam

On July 17, 2018, Frank emailed Perez to let him know that he had passed the written exam and would now move on to the third examination stage, an approximately hour-long telephone "oral exam" with Frank.  PSR ¶ 22.

That same day, Frank sent Dunn an email with an attachment that she wrote contained "the oral interview questions that I plan to use."  *Id.*  That document consisted of 12 draft oral exam

questions and Frank's scoring guide, both of which she ultimately used to conduct the applicants' telephone exams.

On July 18, 2018, Dunn forwarded Frank's email and its attachment to Perez (and to no other applicants), instructing, "Call me please."[4]  *Id.*  On July 20, 2018, Perez requested Officer-1 discretely print that attachment, telling Officer-1, "make sure no one sees it because we are the only ones who have it."  Perez then requested that Officer-1 use these misappropriated exam questions and scoring guide to draft written answers that Perez could use in his telephone interview.  PSR ¶ 23.

Officer-1 did not complete this task before Perez put him on administrative leave on July 26, 2018, following a report that Officer-1 had used racist language.  *Id.*

On July 30, 2018, Perez visited Officer-1's home and discussed Officer-1's discipline.[5]  *Id.* Officer-1 recorded their meeting.  *Id.*  As Perez was leaving Officer-1's home, he asked Officer-1 about the answers to the telephone exam questions which Officer-1 had begun to prepare, inquiring, "where did you leave the stuff you were working on for me?"  *Id.*  When Officer-1 responded that it was in a file stored on his work computer at BPD headquarters, Perez asked him to "sneak in there for me please."  *Id.*

Over the next few days, Perez repeatedly requested Officer-1's help in connection with the chief selection process in a series of calls that Officer-1 recorded.

On July 31, 2018, during a call with Officer-1, Perez gave Officer-1—who was still on administrative leave—instructions on how best to get into BPD headquarters late at night.

---

[4] The next call between Perez and Dunn seems to have occurred on July 22, 2018, and lasted approximately two minutes.

[5] Perez expressed concern about the negative publicity generated by the report, noted that Officer-1 had made "only three" racist comments, and assured Officer-1 that he would try to get the situation "fixed," and that he still "love[d]" Officer-1.  Complaint ¶ 93 n.8.

The next day, August 1, 2018, Officer-1 told Perez that he had not gone to headquarters the night before and asked Perez if he still wanted him to try to get in.  Complaint ¶ 56.  Perez responded, "If you can do it please.  Cause I'm running out of time, [Officer-1].  And you're the only one."  *Id.*  Perez also told Officer-1 the best way to sneak into headquarters, including which specific doors and stairs to use to make sure that nobody was around.  *Id.*  Officer-1 said he would "get [the test questions] together," and that the two of them could then go over them, to which Perez responded, "Yeah," and that he needed to "start studying."[6]  *Id.*

On August 2, 2018, Perez called Officer-1 following a meeting between Perez, Officer-1, BPD Internal Affairs, and other representatives of BPD and the union about Officer-1's disciplinary situation.  Complaint ¶ 57.  After expressing concern for Officer-1, Perez requested, "And if you can bring me that stuff.  I'm lost here man."  *Id.*  Officer-1 responded that he thought he "remember[ed] some of the test questions," and would try to get them together for Perez.[7]  *Id.*

Perez's telephone oral exam took place on August 9, 2018, during which Frank used nine of the twelve questions that Perez had obtained from Dunn.  PSR ¶ 24.  Although Frank determined that all eight remaining applicants scored fairly evenly on the oral exam, one more was eliminated after a background search, leaving seven, including Perez.  *Id.*

For a period of weeks, the examination process stalled, during which media scrutiny of the search for a permanent BPD chief increased.  On September 10, 2018, the Connecticut Post published an article critical of the secrecy surrounding the hiring process.  *See* Brian Lockhart, "City Won't Reveal Chief-Search Panel," CT Post (Sept. 10, 2018),

---

[6] A few hours later, Perez called Officer-1 again.  Perez sobbed and spoke unintelligibly for several minutes, except to express that he missed and loved Officer-1.

[7] Later that afternoon, Perez called Officer-1, and when Officer-1 said he was "trying to struggle through the questions," Perez now responded he should not "worry about" that and should focus on his own situation.  Complaint ¶ 58.

https://www.ctpost.com/local/article/City-won-t-reveal-chief-search-panel-13215328.php.   Perez

was quoted as confirming that he was "a candidate," but falsely stated, "That's all I know. . . .  I've

stayed away from [seeking details about the search process] just to make sure it was objective . . .

I don't want anybody to say 'A.J. influenced'" the process.  PSR ¶ 25.

D.      **Stage 4: Panel Interview**

As one of the seven remaining applicants, Perez was invited to participate in the final

examination stage, the panel interview.

On  October  9,  2018,  Frank  emailed  Dunn  a  document  ("Bridgeport  Police  Chief

Questions") consisting of 42 suggested questions for interview panelists to ask applicants, 15 of

which were highlighted.  PSR ¶ 26.  Two days later, on October 11, 2018, Dunn forwarded Frank's

email to himself at his personal email account (just as he had with the May 2018 scoring guide).

*Id.*  As with questions for the prior interview, Dunn likewise provided a copy of these potential

panel interview questions to Perez.  Def. Mem. at 16.

On  October  17,  2018,  Dunn  called  a  panelist  ("Panelist-1")  and  told  her  that  the  Mayor

"would like to see Perez in the top three."  PSR ¶ 28.  Panelist-1 understood Dunn wanted her to

score Perez higher, or influence the other panelists to do so, to please Mayor Ganim.  *Id.*

On October 19, 2018, Perez and the applicants had their panel interviews.  PSR ¶ 27.  In

advance, Frank provided the panelists each applicant's cover letter, résumé, and written exam

essays (which Perez had instructed Officer-1 and Officer-2 to prepare for him) and her notes from

each applicant's telephone exam (the questions for which Perez had obtained ahead of time from

Dunn).  *Id.*  Frank moderated each applicant's panel interview using several of the highlighted

questions from her October 9 email (which Perez had previously obtained from Dunn).

Perez was ranked second following the panel interviews, and Dunn certified to the Mayor

that Perez was one of the three finalists.   PSR ¶ 29. After learning that he had passed the examination, Perez told Officer-1 in a recorded call, "I owe this to you."  Complaint ¶ 69.

\*   \*   \*

On November 5, 2018, Ganim announced that he had selected Perez to be the permanent chief and awarded him a five-year contract paying $145,428 annually.  PSR ¶ 31.  According to a press article, after his swearing in ceremony, Perez untruthfully bragged, "I did this on my own." *See* Brian Lockhart, "Ganim Makes Perez Bridgeport's Permanent Cop Chief," CT Post (Nov. 5, 2018),   https://www.ctpost.com/local/article/Ganim-makes-Perez-Bridgeport-s-permanent-cop-13364763.php.

Although Perez's salary did not change significantly when he moved from acting chief to permanent chief, under the terms of his contract, he was able to cash out his leave time, worth more than $400,000 (broken into pre-tax payments of approximately $171,000 in January 2019, $127,000 in August 2019, and $127,000 in July 2020).  PSR ¶ 31.  Additionally, that contract guaranteed Perez at least five years as chief—through Ganim's current term—that could be renewed for an additional five-year term.  *Id.*  Thus, had his fraud not been discovered, Perez could have been the BPD chief until 2028.

## II.   Perez's Obstructive Conduct

In an attempt to avoid detection and hinder the Government's investigation, Perez lied about his conduct in two FBI interviews and repeatedly sought to coordinate witnesses' stories. PSR ¶ 33.

### A.   Perez's February 15, 2019 FBI Interview

On February 15, 2019, Perez agreed to an interview with FBI agents in his office at BPD headquarters.   In response to the agents' specific questions, Perez gave numerous false and

misleading answers, including:

- Asked whether he had been coached or had any assistance during the selection process, Perez responded that Officer-1 and Officer-2 had helped write his resume and cover letter, but omitted that Officer-1 and Officer-2 had prepared his written materials and that Dunn had provided him confidential examination information, including the telephone exam and panel interview questions.

- Asked specifically whether Dunn had provided Perez with any confidential information during the selection process, Perez misleadingly responded that, as far as he knew, he had not been provided any confidential information such as dates, times, or interview participants.

- Asked even more specifically whether Perez had received test questions or scoring sheets in advance, or anything else that would give him an advantage over other candidates, Perez falsely replied, "No," and questioned the agents' information ("Why would someone provide that to me?"  "Who is making this complaint?" "Was it [Officer-3, another BPD officer who had applied for the permanent chief position]?")

- Asked whether Dunn had provided him with confidential information during the selection process that would give Perez an advantage, Perez again falsely answered, "no," and stated that he thought that whatever Dunn had provided to him had been provided to everyone else.

PSR ¶¶ 34, 35.

## B.     Perez's Post-Interview Conduct

Almost immediately after his first FBI interview, Perez began communicating with witnesses, including Dunn and others, seeking to influence the investigation.  PSR ¶ 36.

On February 15, 2019, after the FBI left Perez's office, Perez called Dunn, as reflected in toll records.  Complaint ¶ 80.  That same day Driver-1, a civilian employee of the BPD who served as Perez's driver, contacted Officer-1 for Perez because Perez was concerned that his phone was

tapped.  Complaint ¶ 81.  To evade this suspected monitoring, until Driver-1 could find another phone for Perez to use, Perez wanted to call Officer-1 from Driver-1's phone the next morning. *Id.*  Perez told Driver-1 that he was worried about a certain email from Dunn which Officer-1 had seen, and that Officer-1 had opened the email, but that Perez had not.  Driver-1 told Officer-1 that Perez had suggested Officer-1 did not need to speak to the FBI.

The FBI also interviewed Officer-2 on February 15, 2019.  Complaint ¶ 82.  When Officer-2 learned that the FBI wanted to talk with him, he contacted Perez.  Perez told Officer-2 that the FBI had questioned him at his office about who helped with his chief application, the timing of the test, and whether someone received information early during the selection process.  Perez said he felt uncomfortable being caught off guard when speaking to the FBI agents.  *Id.*  After meeting with FBI agents, Officer-2 again called Perez, who asked Officer-2 to stop by his office.  Complaint ¶ 83.  Among other things, Perez falsely claimed to Officer-2 that everything he had received was shared with other candidates.  *Id.*  Perez also said that he was trying to figure out who provided the FBI with information about the selection process, and speculated it was Officer-1 or a former Bridgeport facilities employee.  *Id.*

On February 15, 2019, Perez also spoke with Officer-4, who in addition to being a BPD officer was a member of an FBI Task Force, in an attempt to learn about the FBI's investigation.  PSR ¶ 36.  Officer-4 was directed by a BPD sergeant to report to Perez's office.  There, Perez explained that he was interviewed earlier in the morning by two FBI agents about the examination process, and asked what Officer-4 knew about them.  *Id.*  Officer-4 replied that he knew nothing.  Perez then stated that Officer-1 and Officer-2 had helped him study for the test, and that he thought what he got from Dunn had been given to all of the other applicants.  *Id.*  A BPD union official and friend of Perez's joined the meeting, and Perez brought up on his computer Dunn's email

- 11 -

attaching the telephone exam questions, saying, "I think they may be concerned about this email."

On February 19, 2019, after Perez was served with a grand jury document subpoena through his attorney, Perez requested that Officer-2 come to his office again, where the two met alone.  Complaint ¶¶ 85, 86.  Perez told Officer-2 that he had received a subpoena and had spoken with Dunn, who had told Perez that he had not responded to the agents' request for a meeting, and that the agents no longer need to speak with him (Dunn).  Complaint ¶ 86.  Perez stated that he could resign if "something happens."  *Id.*  Although Officer-2 tried to avoid speaking about the investigation, Perez brought up Dunn's July 18 email attaching the telephone exam questions; Perez said that he thought everyone had received it, leaving Officer-2 with the impression that only Perez had received it and that had been improper.  *Id.*

In April 2020, Perez agreed to a second FBI interview.  In advance of this interview, Perez showed up at Officer-2's BPD office unannounced for the first time, asked whether Officer-2 had been interviewed by the FBI again, and admitted to Officer-2 that he had omitted certain facts during his February 15, 2019 interview.  PSR ¶ 39.

### C.    Perez's May 1, 2020 Proffer

On May 1, 2020, Perez was interviewed at the U.S. Attorney's Office, subject to a proffer agreement.  PSR ¶ 40.  Although accompanied by counsel, warned about making false statements, and given an opportunity to amend or correct anything he had said, Perez continued to make false and misleading statements, including:

- Perez continued to falsely claim that he thought all the applicants in the chief selection process had received the same information.

- Perez falsely claimed that during the February 15, 2019 interview, he told the FBI agents that he had received test questions in an email from Dunn.

- Perez falsely denied receiving any other examination materials from Dunn, and

specifically denied receiving the panel examination questions from him.

- Perez repeatedly falsely denied speaking with Dunn about the investigation following his February 15, 2019 interview, claiming that he intentionally avoided doing so because he felt it would have been inappropriate.[8]

- Perez falsely claimed that he had only seen Officer-1 twice after putting Officer-1 on administrative leave on July 26, 2018 (omitting Perez's July 30 visit to Officer-1's home, during which Perez asked Officer-1 to sneak into BPD headquarters to retrieve the draft answers to the telephone exam questions).

- Perez falsely denied that after Officer-1's last day, Perez had instructed him to sneak into BPD headquarters to retrieve his work on the interview questions, and falsely stated that he had actually told Officer-1 not to do so because people might see him.

PSR ¶¶ 40-41.

## III.    The Charges, Perez's Guilty Plea, and Plea Agreement

On September 9, 2020, Perez was charged in a 25-page complaint (3:20-mj-776-WIG, Dkt. #1), with conspiracy to commit wire fraud, wire fraud, and two counts of false statements.

On October 5, 2020, Perez waived indictment and pled guilty, pursuant to a plea agreement, to a two-count Information charging conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and making false statements in violation of 18 U.S.C. § 1001(a)(2). PSR ¶ 1. Perez admitted in the plea agreement to all of the conduct alleged in the complaint.

As part of that plea agreement, Perez agreed to pay $149,407 in restitution to the City (jointly and severally with Dunn), representing the City's direct loss as a result of the fraud. PSR ¶ 42. Subsequently, the City requested additional compensation for legal fees and the costs

---

[8] When pointedly asked whether he had in fact met with Dunn at a Starbucks in Stratford shortly after his FBI interview, Perez immediately admitted that he had done so, repeatedly apologized, and said he had panicked in his previous denials.

of its own investigation, and recently agreed with Perez (and Dunn) on a total restitution amount of $299,407.

**DISCUSSION**

In this case, a meaningful term of imprisonment is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

## I.      The Sentencing Guidelines

As the Court is aware, district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007). Here, consistent with the Probation Department's calculations, the parties agree that the applicable advisory Guidelines range include 18-24 months' imprisonment and an applicable fine range of $7,500 to $75,000. PSR ¶¶ 102, 112.

## II.     The Statutory Sentencing Factors

After determining the Guidelines range, the Court must weigh the sentencing factors under 18 U.S.C. § 3553(a).

### A.      The Nature and Seriousness of the Offense

Perez's conduct was unquestionably serious. As described above, he participated in a scheme to defraud the City of Bridgeport that he executed over a period of months, that involved numerous steps and efforts to cheat, and that affected every stage of the examination process. In doing so, Perez prioritized his own interests above the City, the Police Department, and the laws

he had sworn to uphold as the City's top law enforcement officer. The financial damage he caused the City is quantifiable, in the $17,000 that the City wasted on the purportedly fair and transparent selection process required by the City Charter, the $67,054 of inflated salary that the City paid to Perez as chief under false pretenses, and the $65,352 boost to Perez's retirement payout to which the City agreed.

But Perez's betrayal also caused other harms to the City and its citizens that are just as pernicious, if harder to measure. Perez's conduct has significantly undermined trust in the BPD and the City's government. Perez and his co-defendant took from the citizens of Bridgeport their expectation that the City would be run in their best interests, and not be manipulated for the benefit of influential and well-connected individuals. Perez and his co-defendant's scheme also deprived honest candidates of a legitimate chance to lead the City's police department. That Perez claims to have engaged in this scheme out of a desire for prestige and power, or as he put it, a desire for a "crowning achievement" (Def. Mem. at 1) at the end of his career, instead of for greed (notwithstanding its significant financial benefits and the security of a five-year contract) does not mitigate the harm or seriousness of the offense.

Also militating in favor of a meaningful sentence is *how* Perez committed his fraud. He repeatedly abused his position to use others over whom he had authority and influence to perpetrate the scheme and to help ensure that his conduct would go unreported. As detailed above, Perez enlisted the assistance of two senior BPD officers to impermissibly complete his test questionnaire, essay questions, and prepare for the first interview. In so doing, Perez put these officers' careers at risk, regardless of whether they understood Perez's criminal intent or the import of their own actions.

Perez's abuse of his role as the City's top law enforcement officer alone demands a

substantial sentence.   But he compounded his culpability with his conduct during the Government's investigation.   As described above, when Perez learned that the FBI was investigating him, he embarked on a campaign of obstruction.   First, Perez lied when he was initially approached by the FBI.   Then, Perez immediately began contacting other witnesses and other BPD officers in order to get their stories straight and learn about the FBI's investigation. Most significantly, more than a year after his first interview, Perez again chose to lie to the FBI during a meeting with the U.S. Attorney's Office, despite the benefit of counsel and multiple warnings of the danger of making false statements.   This deceptive and obstructive course of conduct was far more deliberate and extensive than he suggests in his sentencing memorandum. *See* Def. Mem. at 16-17.

Although Perez acknowledges his offense was "serious," he does not directly address the wide-ranging impact of his crimes in his submission.   Instead, Perez highlights the fact that he has lost his job as a result of his conduct, has suffered financially, and has brought shame and embarrassment to himself.   Def. Mem. at 2-3.   That Perez lost his job and is suffering financial consequences as a result of committing crimes against his former employer is unremarkable, and therefore cannot support his suggested non-incarceratory sentence.   Moreover, many defendants— particularly corrupt public officials—approaching sentencing having been "shame[d] and vilif[ied]" (Def. Mem. at 1) for their conduct.   If that were sufficient to offset the seriousness of an offense, then the most successful defendants—by virtue of having the best reputations and the most material goods to lose—would receive the lowest sentences, but that should not be the case here.

A meaningful term of imprisonment is an appropriate response to Perez's serious criminal conduct.

### B.      Deterrence

By imposing a meaningful term of imprisonment, the Court would send a clear message that corruption at the highest echelons of City government is not only wrong but carries significant personal consequences.  Perez and his co-defendant's corruption—and the history of similar cases in Bridgeport—show that such a message is necessary.  If the justice system is to have an impact on public corruption in the City and help restore faith in good governance, then the sentences it imposes must consistently demonstrate that criminal conduct by public officials is not just "how things are done in Bridgeport."  Def. Mem. at 16.  A non-incarceratory sentence for a criminal chief of police would substantially diminish this deterrent message.

Additionally, as is apparent, Perez's scheme was difficult to uncover and has caused damage that will be just as difficult to undo.  When such an intricate and damaging scheme is uncovered, a substantial sentence is warranted.  *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

The defendant claims, in sum and substance, that the mere fact that he was prosecuted, required to pay restitution, and lost his job are adequate deterrence.  Def. Mem. at 4-5.  While those consequences likely will specifically deter Perez from committing further crimes, they are

not sufficient for purposes of general deterrence.  Indeed, the collateral consequences the defendant cites are no different than those typically associated with any defendant's federal crimes, and yet Perez himself was not deterred, despite a career spent in law enforcement and having previously played a minor role in the City's largest corruption scandal.  Something more than just a felony record and financial pain is required to adequately deter others after Perez is no longer in the headlines.

Perez also is wrong to suggest that the "shame" he has experienced justifies a non-incarceratory sentence.  Def. Mem. at 1, 14.  It is true that, at the time of the offense, Perez had established connections and was held in high-esteem—he had been the acting police chief in the state's largest city.  And it is also the case that Perez has been brought low by exposure of his criminal conduct.  Yet Perez's personal humiliation should not mitigate his sentence; that approach would lead to indulgence for a well-regarded defendant who used his station to secretly victimize his community, rather than the more severe sentence such conduct deserves and deterrence requires.

A meaningful term of imprisonment would send such a deterrent message to others tempted to follow Perez's example.

### C. Other Sentencing Factors

Perez suggests that his background warrants leniency, particularly his service as a BPD officer.  Def. Mem. at 3, 10-13.  But while the defendant's prior service is admirable, he took advantage of that service and the trust of those who had known him for years (including other BPD officers) to commit his crimes.  His personal history does not excuse what he did—and, if anything, his career as a police officer exacerbates the impropriety of his conduct.

Relatedly, the Government credits Perez's descriptions of his background and the

relationships with his friends and family (Def. Mem. at 3, 13), which are doubtlessly important to those involved.  This conduct is laudable and worthy of consideration by the Court under § 3553(a).  However, although the various letters written in support of Perez attest to a strong moral character, the facts of the offense demonstrate that, to the contrary, he was all too willing to engage in a long-term fraud and use those reporting to him to get what he wanted.  And while he has now accepted responsibility for his conduct, Perez only did so after a failed campaign of obstruction that extended for more than a year and after being charged with the instant offenses.

In addition, Perez describes certain physical and psychological conditions from which he suffers.  Def. Mem. at 6-7, 14.  This too the Court should take into account, but none of Perez's conditions appear unique for a defendant his age, none prevented him from committing his crime or engaging in obstructive conduct, and there is no basis to believe that they cannot be treated appropriately in prison.  As the Court is aware, the Federal Bureau of Prisons is well-equipped to handle all such conditions, including, if need be, in a Federal Medical Center (although the defendant's conditions appear both stable and manageable).[9]  While COVID-19 undoubtedly poses particular challenges in a prison setting, as the Court is aware, BOP has undertaken significant efforts to limit the spread of the virus and even Perez acknowledges that he will soon be fully vaccinated.  Def. Mem. at 7.

Lastly, in fashioning an appropriate sentence for Perez, the Government agrees that the Court should be mindful of Section 3553(a)'s command to avoid unwarranted sentencing disparities and does not dispute the defendant's statistical analysis of individuals with his advisory Guidelines range or in his age bracket.  However, as the sentencing data reflects, the majority of

---

[9] Indeed, although the medical report the defendant submitted to the Court suggests he should be monitored, it does not suggest another evaluation is necessary for 12-18 months.  Def. Mem. at 14.

those individuals received a sentence of imprisonment.  Def. Mem. at 20.  Moreover, the Government is unaware of any case, in any district, in which the top municipal law enforcement officer abused his position, defrauded the city he was supposed to protect, and then, when under investigation, engaged in extensive obstructive conduct, and did not receive a substantial sentence.[10]

To the extent that Perez asks this Court to consider specific cases, those comparisons are inapt.  For instance, the facts of this case are worse than those in *United States v. Scinto*, 3:10-cr-207-CSH (cited at Def. Mem. at 5-6, 23).  In that case, the defendant was a Shelton developer who bribed public officials in return for building project approvals, and was convicted of falsely denying making such bribes in an FBI interview.  Unlike Perez, Scinto was not a public official, not in law enforcement (much less the top law enforcement official), did not abuse his position of authority, and did not undertake a months-long campaign to obstruct justice.  That said, even despite these less serious circumstances, Scinto was sentenced to a six-month term of imprisonment.

Nor is this case like *United States v. Clinesmith*, 20 Cr. 165 (JEB) (D.D.C.) (cited at Def. Mem. at 6, 23), where the defendant was sentenced to probation.  That defendant was an FBI attorney who altered an email that investigators relied on to seek court permission for continued interception.  However, unlike Perez, there was no underlying fraud, no sustained course of

---

[10] *See, e.g., United States v. Kerik*, 07 Cr. 1027 (S.D.N.Y.) (former New York City police commissioner sentenced to four years' imprisonment for multiple felony charges, including tax fraud and false statements); *United States v. Boyd*, 2:15 Cr. 235 (C.D. Cal.) (former chief of police of the Port of Los Angeles sentenced to two years' imprisonment for tax fraud and making false statements to the FBI); *United States v. Burke*, 15 Cr. 627 (E.D.N.Y) (former Suffolk County police chief sentenced to 46 months' imprisonment for violation of civil rights and obstruction of federal investigation); *United States v. Marraccinni*, 19 Cr. 42 (S.D.N.Y.) (former town police chief sentenced to 18 months' imprisonment for tax-evasion scheme).

criminal conduct, no benefit to the defendant, and no cover-up.

Perez should be sentenced for who he is, what he did, and how he did it, regardless of the sentences imposed in those other cases.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a meaningful term of imprisonment, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK

_____/s/_____
ELI J. MARK
JEFFREY C. COFFMAN
SPECIAL ATTORNEYS ACTING UNDER
AUTHORITY CONFERRED BY 28 U.S.C. § 515

JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT
Fed Bar No. phv05083
jonathan.francis@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700
jonathan.francis@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 5, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
